**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| The Hanover Insurance Company, as Subrogee of Estvold Oilfield Services, Inc. and Estvold Hot Oil Service, Inc.,<br><br>Plaintiff,<br><br>vs.<br><br>Ameribuilt Buildings, Inc., Lake Country Contractors, John Bouvette, Construction With R&R, LLC, and Dave Rud,<br><br>Defendants. | **ORDER**<br><br>Case No. 1:19-cv-46 |

Before the Court are two motions for summary judgment.[1] The first motion was filed by Defendant Ameribuilt Buildings, Inc. ("Ameribuilt") on September 9, 2021. Doc. No. 38. On September 30, 2021, Plaintiff The Hanover Insurance Company, as Subrogee of Estvold Oilfield Services, Inc., and Estvold Hot Oil Service, Inc. (collectively, "Hanover") filed its response. Doc. No. 48. Ameribuilt filed its reply on October 13, 2021. Doc. No. 54. The second motion was filed by Lake Country Contractors ("Lake Country") and John Bouvette ("Bouvette") (together, "Lake Country/Bouvette") on September 13, 2021. Doc. No. 44. Hanover filed its response on October 6, 2021. Doc. No. 52. On October 29, 2021, Lake Country/Bouvette filed its reply. Doc. No. 56. For the reasons below, the motions are granted in part and denied in part.

## I. BACKGROUND

This action centers on the collapse of a pole barn during a high windstorm in July 2016. The parties dispute, among other things, what caused the collapse of the pole barn. Hanover asserts

[1] Defendants Construction With R&R ("R&R") and Dave Rud ("Rud") (collectively, referred to as "R&R/Rud") filed a motion for summary judgment on September 9, 2021 (Doc. No. 42), but later withdrew the motion. Doc. No. 84.

that the pole barn's collapse was caused by the allegedly negligent construction of the truss-to-column connections and the Defendants' failure to identify these allegedly negligent connections. See Doc. No. 19, ¶¶ 20-21, 29, 34-35, 40, 42-47. Accordingly, Hanover initiated the action, asserting contract and tort claims against Ameribuilt, R&R/Rud, and Lake Country/Bouvette.

Ameribuilt is a corporation that provides materials for buildings. Ameribuilt sold the materials for the pole barn at issue here and hired a subcontractor to construct the pole barn. Lake Country/Bouvette provides construction services and was hired by Ameribuilt to construct the pole barn. Doc. No. 46-1, p. 6. R&R/Rud sold Ameribuilt buildings, and in this case, sold the pole barn to Estvold Oilfield Services, Inc. and Estvold Hot Oil Service, Inc. (collectively, the "Estvold Corporations") and/or Jake Estvold ("Estvold").[2] Doc. No. 49-5, p. 4. The Estvold Corporations insured the pole barn, through an insurance policy with Hanover.[3] Doc. No. 40-4, pp. 3-4.

**A. The Sale of the Pole Barn.**

At some point, Estvold called Rud wanting to purchase a building. Rud sells Ameribuilt buildings, so he inquired about certain building specifications and filled out a customer proposal, dated February 20, 2012.[4] Doc. No. 49-4, p. 1.

The customer proposal lists a "90 mph wind load" under the Accessories section. Doc. No. 49-4, p. 1. The 90 mile an hour wind load was in the proposal "[t]o assure the customer that's what

---

[2] In the amended complaint, Hanover alleges that the Estvold Corporations contracted with Ameribuilt for the construction of the pole barn at issue. Doc. No. 19, ¶ 9. Rud and Bouvette, however, considered Jake Estvold as the customer of the project. Doc. No. 49-5, p. 4; 46-1, p. 7.

[3] Pursuant to this insurance policy, when the pole barn collapsed, Hanover paid money to or on behalf of the Estvold Corporations and became the subrogee to their rights and claims. See Doc. No. 19, ¶¶ 16-17. As such, Hanover brings tort and contract claims against the Defendants. See Doc. No. 19, ¶¶ 18-48.

[4] The parties dispute whether Rud is an Ameribuilt employee. The Court addresses the facts supporting each party's arguments more in depth in its analysis.

he was going to get," according to Rud. Doc. No. 49-5, p. 3. Rud acknowledged, however, that without stamped engineer plans, there was no way to verify if the building meets the wind load requirement. Id. Although Rud offered Estvold stamped plans for the pole barn, Estvold declined to get stamped plans.

On or about March 30, 2012, Ameribuilt and Estvold executed a contract, numbered 3621 (the "March 30 Contract"). Doc. No. 40-1, p. 1. The March 30 Contract described the pole barn as an "AB 80 Heated Shop." Id. Additionally, Ameribuilt agreed to "to furnish labor and materials" for $301,598, paid as follows:

| | |
|---|---|
| Down Payment (to sales representative) | $31,598 |
| On Delivery | $200,000 |
| Frame Up | $65,000 |
| On Completion | $5,000 |

Id. The March 30 Contract also provides that Ameribuilt "is not liable under any circumstances for consequential damages, including, but not limited to, any damages relating to the completion date." Id. While it does not name a specific subcontractor, Lon Isaacson, who is Ameribuilt's President, acknowledged that Ameribuilt's job was to "provide the materials and bring on an erector to actually build the building." Doc. No. 43-5, p. 10. Indeed, typically after the parties sign this type of contract, Ameribuilt then schedules a date for the "delivery of the building" and hires a subcontractor for the project. Id., p. 12.

**B. The Construction of the Pole Barn.**

Ameribuilt ultimately retained Lake Country/Bouvette as the subcontractor to construct the pole barn. Doc. No. 46-1, p. 7. To that end, Ameribuilt and Lake Country/Bouvette executed a building labor proposal (the "Lake Country Subcontract"). In the Lake Country Subcontract, Lake Country/Bouvette agreed "to erect per specifications on contract #3621 the Jake Estovold [sic]

building project located at New Town N.D."[5] Doc. No. 40-3, p. 1. For the work, Lake Country would be paid somewhere between $85,000-$88,000. Id.

During the construction phase, Ameribuilt, Lake Country/Bouvette, R&R/Rud,[6] and Estvold each had different roles. For example, Ameribuilt provided Lake Country/Bouvette with general instructions as to how to construct the pole barn in the form of building drawings, which provided the spacing between poles and the height of the rafters, among other things.[7] Doc. No. 46-1, p. 13. In addition to the building drawings, Ameribuilt provided Lake Country/Bouvette with the materials to build the pole barn. Doc. No. 46-1, p. 12. More specifically, Ameribuilt provided columns, trusses, steel, insulation, and nails. Most of these materials were shipped to the building site, and all the materials were onsite once Lake Country/Bouvette arrived to begin construction. Doc. No. 46-1, p. 12.

For its part, Lake Country/Bouvette erected the pole barn which included "drilling the holes, setting the poles, squaring up the building, putting all the purlins on, rafters on, the steel on the outside, the garage doors, the windows, insulating it and tinning the inside." Doc. No. 46-1, p. 11. Additionally, Lake Country/Bouvette attached the trusses to the columns of the structure, in what is called a "truss-to-column" connection.[8] Id., p. 12. The parties dispute how many and what type of nails Lake Country/Bouvette used in the truss-to-column connections in this case.

---

[5] The parties dispute whether Lake Country/Bouvette knew about any specific purposes for which the pole barn was intended. The Court addresses the facts supporting each party's arguments more in depth in its analysis.

[6] The parties dispute R&R/Rud's role in the construction of the pole barn. The Court therefore will address the facts supporting each party's arguments more in depth in its analysis.

[7] Apart from the drawings, however, no one from Ameribuilt told Lake Country/Bouvette how to construct the buildings. Doc. No. 46-1, p. 13.

[8] To complete a truss-to-column connection, generally, a builder cuts two pieces out of the column, drops the truss into the opening, and then secures the truss with nails. Doc. No. 46-1, p. 13.

Jake Estvold poured the concrete. Here, "the columns extended into and were supported by the soil, and had concrete poured around them." Doc. No. 49-1, p. 4. Indeed, as Isaacson testified, "That's the beauty of a post frame. Most of that other work can be done and is done after the fact. The concrete floor is poured after the building is up." Doc. No. 43-5, p. 13. All told, construction of the pole barn was likely completed sometime in 2013. See Doc. 49-1, p. 2.

**C. The Collapse of the Pole Barn.**

About three years later, on July 31, 2016, the pole barn collapsed. Id., p. 3. At the time of the collapse, Estvold Oilfield Services had the pole barn insured through an insurance policy with Hanover. Doc. No. 40-4, p. 4. After the collapse, Hanover sent James Woods, who at that time was an executive general adjuster, to the building site in early August. Id., p. 11. According to Woods, the pole barn's roof collapsed. See id., pp. 12, 18. Approximately three weeks after the storm, Estvold's insurance claim was negotiated, settled, and a release was signed. Id., p. 9, 11. Hanover retained its subrogation rights and eventually filed suit against the Defendants. Id., p. 10.

**D. Procedural Posture.**

This case was removed to federal court on March 4, 2019, and Hanover filed an amended complaint on May 27, 2020. Docs. No. 1, 19. In its amended complaint Hanover raises four claims against the Defendants: negligence (count I), negligence per se (count II), breach of implied warranty of fitness (count III), and breach of contract (count IV). Ameribuilt and Lake Country/Bouvette each filed separate motions for summary judgment. See Docs. No. 39, 45.

## II. LAW AND ANALYSIS

Unsurprisingly, the parties dispute what caused the collapse of the pole barn.[9] Hanover argues that the pole barn collapsed because the truss-to-column was "inadequate." Doc. No. 40-4, p. 14. On the other hand, the Defendants argue that the windstorm caused the pole barn to collapse. See Doc. No. 40-2, p. 5; Doc. No. 43-5, p. 16; Doc. No. 45, ¶ 8. These issues, in addition to others, are central to Ameribuilt's and Lake Country/Bouvette's motions for summary judgment. The Court will address the parties' arguments, to the extent necessary, through the framework of Hanover's four claims in the amended complaint: breach of contract (count IV), breach of implied warranty of fitness (count III), negligence (count I), and negligence per se (count II).

### A. Summary Judgment Standards

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" Dick v. Dickinson State Univ., 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting Anderson, 477 U.S. at 248). Courts must afford "the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to

[9] The parties also disagree as to whether the 2011 North Dakota State Building Code applied to the pole barn. Compare Doc. No. 49-1, p. 5, with Doc. No. 49-7, p. 7.

speculation." TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707 (8th Cir. 2016) (quoting Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 611 (8th Cir. 2014)).

"At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." Nunn v. Noodles & Co., 674 F.3d 910, 914 (8th Cir. 2012) (citing Anderson, 477 U.S. at 249). If the movant demonstrates the absence of a genuine issue of material fact, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). "However, if a plaintiff cannot support each element of its claim, summary judgment must be granted, because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial." Cousineau v. Norstan, Inc., No. 00-1113 DSD/JGL, 2001 WL 1640118, at *3 (D. Minn. July 26, 2001), aff'd, 322 F.3d 493 (8th Cir. 2003) (citing Celotex, 477 U.S. at 322-23). Rule 56 requires a proper summary judgment motion to be opposed by the kinds of evidentiary materials listed in Rule 56(c), such as depositions, documents, affidavits or declarations, stipulations, admissions, and interrogatory answers. See Celotex, 477 U.S. at 324.

This action is based on diversity jurisdiction. Therefore, the Court will apply North Dakota substantive law. See DJ Coleman, Inc. v. Nufarm Americas, Inc., 693 F. Supp. 2d 1055, 1059 (D.N.D. 2010).

### 1. Breach of Contract (Count IV)

Ameribuilt moves for summary judgment on Hanover's breach of contract claim and raises several arguments as to why it is entitled to summary judgment on the breach of contract claim.

First, it argues that the March 30 Contract is governed by the North Dakota's Uniform Commercial Code ("UCC"), and as such, its statute of limitations bars Hanover's breach of contract claim. See Doc. No. 39, pp. 7-8. The Court disagrees.

North Dakota's UCC "applies to transactions in goods." N.D. Cent. Code § 41-02-02. Here, the parties dispute whether the March 30 Contract is for goods or services. As previously explained by this Court:

> North Dakota utilizes the "predominant factor" test to determine whether a transaction is a "sale of goods" covered by Article 2 of the U.C.C. or "service" outside the scope of Article 2. Air Heaters, Inc. v. Johnson Elec., Inc., 258 N.W. 2d 649, 652 (N.D. 1977). In Air Heaters, the North Dakota Supreme Court adopted the test applied in Bonebrake v. Cox, 499 F.2d 951 (8th Cir. 1974), to determine whether Article 2 of the U.C.C. applies to a mixed "goods" and "service" contract. Id.
>
>> The test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of a service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom).

Kraft v. Essentia Health, No. 3:20-CV-121, 2020 WL 9749505, at *4 (D.N.D. Dec. 3, 2020) (internal citation omitted). The predominant factor test, therefore, only applies to "mixed" contracts involving both goods and services.

Hanover argues that, as a threshold matter, the March 30 Contract is not a "mixed" contract but is instead a contract for services only, namely construction of a pole barn. See Doc. No. 48, pp. 5-6. More specifically, Hanover asserts that the pole barn is not a "good," as defined under the UCC, because it was "undisputedly going to be a structure that would be secured to the real estate" and as such, was not "moveable." Id., p. 5. This argument, however, fails on the specific facts of this case.

Under North Dakota law, "Goods" are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale[.]" N.D. Cent. Code § 41-02-05. Accordingly, courts consider whether a good is movable or not "at the time of identification to the contract for sale." Id.; see also Bonebrake v. Cox, 499 F.2d 951, 958 (8th Cir. 1974) (To come within the definition of goods, "articles (the 'things') must be movable, and the movability must occur at the time of identification to the contract."); Meeker v. Hamilton Grain Elevator Co., 442 N.E.2d 921, 923 (Ill. App. Ct. 1982) (explaining Bonebrake "also discussed identification and movability; the seller's estate argued that the bowling equipment was outside Article 2 because the items were to be attached and made immovable. The court rejected this for two reasons: (1) under section 2–105, defining 'goods,' the items must be movable only at the time of identification, which in that case occurred before the equipment was installed, and (2) alternatively, the bowling lanes came in pre-fabricated sections, which were to be set in the floor and screwed together, meaning that they were movable until that time. In discussing this second reason the court observed that the contract was for used lanes, so their earlier use had not rendered them immovable.").

Here, at the time of identification in the contract for sale, the pole barn was not yet constructed and consisted entirely of disassembled materials, such as steel, trusses, columns, and nails. These goods were then shipped out to the building site and were clearly movable at the time of identification in the contract. See Doc. No. 46-1, p. 12. Accordingly, on these facts, the pole

barn was "moveable" under North Dakota's UCC.[10] Thus, the Court finds that March 30 Contract is a mixed contract and will apply North Dakota's predominant factor test.

The North Dakota Supreme Court has explained the predominant factor test this way:

> In contracts involving both a sale of goods and a rendition of services, if the predominant factor, the thrust, the purpose reasonably stated is the sale of the goods with the rendition of services incidentally involved, the contract is for a sale of goods and the Uniform Commercial Code is applicable; if the predominant factor, the thrust, the purpose reasonably stated is the rendition of services with the sale of goods incidentally involved, the contract is one for services and the Uniform Commercial Code is not applicable.

Robertson Companies, Inc. v. Kenner, 311 N.W.2d 194, 199 (N.D. 1981). "To decide whether goods or services predominate in a mixed contract, courts often consider the contract language, the business of the supplier, and the 'intrinsic worth' of the goods involved. Courts also commonly compare the relative cost between the goods and services in the contract." Kraft, 2020 WL 9749505, at *5 (citing Duxbury v. Spex Feeds, Inc., 681 N.W.2d 380, 386-87 (Minn. Ct. App. 2004)).

Ameribuilt argues the predominate purpose of the March 30 Contract was for the sale of goods and relies heavily on Robertson. Doc. No. 54, p. 2. In Robertson, Robertson contracted with Kenner to "build two galvanized steel buildings." Robertson Companies, Inc., 311 N.W.2d at 196. Notably, in Robertson, the concrete slabs for the buildings were poured before construction. See id. The North Dakota Supreme Court considered whether the contract was for the sale of goods. Id. at 199-200. The North Dakota Supreme Court ultimately concluded that under the predominant

[10] Hanover attempts to analogize this case to Leno v. K&L Homes, Inc., 2011 ND 171, 803 N.W.2d 543. Leno, however, is distinguishable. In Leno, the Lenos purchased "a newly-constructed house," and North Dakota Supreme Court opined that a "house affixed to real property is not a good that is movable[.]" Leno, 2011 ND 171, ¶¶ 2, 18. This Court agrees that a house affixed to real property, at the time of identification in the contract for sale, is not a good that is movable. However, those are not the facts of this case.

factor test, the "main purpose of the contract was the sale of grain storage facilities." Id. at 199. In a footnote, it explained that "[t]he contractual language is supportive of this position. It requires Robertson to 'provide, deliver, and erect' two new buildings." Id. at 200 n.7. It further highlighted that the purchaser "was to pay a single price for the completed package." Id. at 200. Additionally, and importantly, the North Dakota Supreme Court explained, "The fact that the storage facilities were in existence only as disassembled materials at the time of the execution of the contract, did not change their status as goods. These buildings, even upon full assembly, are capable of being detached from their foundations and are thus 'movable.'" Id.

At first blush, Robertson appears potentially dispositive. Under the March 30 Contract, Ameribuilt agreed "to furnish labor and materials," which is arguably like Robertson. Doc. No. 40-1, p. 1. But this is where the similarities end. Unlike the contract in Robertson, the March 30 Contract lists Ameribuilt's Minnesota Contractors' license number and requires the purchaser to "provide Builder's Risk Insurance in the amount of this contract." Id., p. 2. Additionally, Ameribuilt agreed to transfer all manufacturer's warranties "[u]pon completion of the construction and payment in full." Id., p. 1. It also lists both a "Desired Delivery Date" of June and a "Desired Completion Date" as "ASAP." Id. And, unlike in Robertson where the purchaser "was to pay a single price for the completed package," the March 30 Contract provides that Estvold was to pay on a schedule based on delivery, frame up, and on completion. Id. The language and payment schedule in the March 30 Contract support the proposition that its predominant purpose was for services, and goods were only incidentally involved.

This conclusion is further bolstered by the fact that, unlike in Robertson, the pole barn was not moveable after full assembly. Indeed, Isaacson testified that with a post-frame building, such as the pole barn, the "the concrete floor is poured after the building is up." Here, the concrete was

poured after the building was up, and the pole barn's "columns extended into and were supported by the soil, and had concrete poured around them." Doc. No. 49-1, p. 4. So, the pole barn was not moveable after full assembly, which further distinguishes this case from Robertson.

Considering the facts in the light most favorable to Hanover and drawing all reasonable inferences in its favor, under North Dakota's predominant factor test, the purpose of the March 30 Contract was to provide construction services with the sale of goods incidentally involved. As such, and on these facts, the UCC is not applicable, and the statute of limitations under North Dakota Century Code section 41-02-104 does not bar Hanover's breach of contract claim. Thus, the Court denies Ameribuilt's motion for summary judgment on the breach of contract claim.

On a separate but related issue, Ameribuilt and Lake Country/Bouvette each ask the Court to enforce a consequential damages clause from the March 30 Contract. Hanover argues the consequential damages clause is ambiguous and is therefore unenforceable. At first blush, it appears the consequential damages clause would likely be enforceable as to Ameribuilt but unenforceable as to Lake Country/Bouvette, who was not a party to that agreement. However, a motion for summary judgment is dispositive of, and generally resolves, claims. Fed. R. Civ. P. 56. Here, resolving the enforceability of the consequential damages clause would not resolve the breach of contract claim, so the Court is unwilling to grant any party summary judgment as to the consequential damages clause in the March 30 Contract. In the Court's view, this issue would be better suited for resolution in a motion in limine, where all parties can fully brief the interpretation issue. As such, the Court declines to decide the consequential damages issue as a part of the motions for summary judgment, but all parties are free to raise this issue for decision before trial.

**2. Breach of implied warranty of fitness (count III)**

As to the breach of implied warranty of fitness claim (count III), Ameribuilt relies on its argument that this claim (like the breach of contract claim) is barred by the statute of limitations found in North Dakota's UCC. See Doc. No. 39, pp. 7-8. However, as noted above, the statute of limitations in North Dakota's UCC does not apply to the breach of contract claim (count IV). For the same reasons, the Court also finds that the statute of limitations in North Dakota's UCC does not apply to Hanover's breach of implied warranty of fitness claim. Accordingly, the Court denies Ameribuilt's summary judgment motion as to that claim.

Lake Country/Bouvette also moves for summary judgment on the breach of implied warranty of fitness claim. Doc. No. 45, p. 7. This implied warranty has been explained by the North Dakota Supreme Court as follows:

> the doctrine of implied warranty of fitness for the purpose applies to construction contracts under circumstances where (1) the contractor holds himself out, expressly or by implication, as competent to undertake the contract; and the owner (2) has no particular expertise in the kind of work contemplated; (3) furnishes no plans, designs, specifications, details, or blueprints; and (4) tacitly or specifically indicates his reliance on the experience and skill of the contractor, after making known to him the specific purposes for which the building is intended.

Dobler v. Malloy, 214 N.W.2d 510, 516 (N.D. 1973). In focusing on the fourth element, Lake Country/Bouvette argues it allegedly "did not know the specific purpose for which the building was intended." Doc. No. 45, p. 7. Specifically, it asserts that "the 90 mile-per-hour wind load specification was never communicated[.]" Id. Hanover argues there is "conflicting evidence in the record" regarding whether the wind load was conveyed to Lake Country/Bouvette. Doc. No. 52, p. 6.

Without question, there is a genuine issue of material fact regarding whether the specific purposes of the pole barn, including, per the parties, the desire for a 90 mile per hour wind load,

were made known to Lake Country/Bouvette. The "90 mph wind load" is listed in the customer proposal between Estvold and Ameribuilt. Doc. No. 49-4, p. 1. The customer proposal, according to Bouvette, is incorporated into the March 30 Contract. Doc. No. 46-1, p. 9. But, Bouvette testified that the first time he saw the customer proposal and March 30 Contract was at his deposition, which was long after the construction (and subsequent collapse) of the pole barn. Id. Bouvette further testified that, when constructing the pole barn, he was not aware of a wind load requirement. Id., p. 8.

There is a genuine issue of material fact regarding whether the specific purposes for which the pole barn was intended were made known to Lake Country/Bouvette. See Nunn, 674 F.3d at 914 ("At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial."). As such, the Court denies Lake Country/Bouvette's summary judgment motion as to Hanover's breach of implied warranty of fitness claim (count III).

**3. Negligence (count I)**

With the contract claims resolved, the Court turns to the tort claims. As to the negligence claim (count I), there is a threshold question of whether the negligence claim is barred by the economic loss doctrine. "Under the [economic loss] doctrine, economic loss resulting from damage to a defective product, as distinguished from damage to other property or persons, may be recovered in a cause of action for breach of warranty or contract, but not in a tort action." Steiner v. Ford Motor Co., 2000 ND 31, ¶ 7, 606 N.W.2d 881. "The economic loss doctrine distinguishes between bargain expectation interests, which are protected under contract law, and safety interests, which are protected under tort law." Id. ¶ 11.

Hanover argues that the economic loss doctrine does not apply because "there is no defective product at issue." Doc. No. 48, p. 8. It contends that "this case involves defects in the design and construction of the pole barn." Id. As previously stated by this Court:

> The North Dakota Supreme Court's analysis of the economic loss doctrine has been in the context of defective products. See, e.g., Steiner v. Ford Motor Co., 606 N.W.2d 881 (N.D. 2000); Clarys v. Ford Motor Co., 592 N.W.2d 573 (N.D. 1999); Cooperative Power Ass'n v. Westinghouse Elec. Corp., 493 N.W.2d 661, 666 (N.D. 1992); Hagert v. Hatton Commodities, Inc., 350 N.W.2d 591, 595 (N.D. 1984). The North Dakota Supreme Court has not provided guidance with regard to whether the economic loss doctrine applies in other contexts, such as construction contracts. In light of the absence of binding authority regarding the economic loss doctrine in North Dakota, this Court declines to base its decision in the present case on that doctrine.

JKC Michaels LLC v. KTJ Ltd. P'ship Eighty-Four, No. 3:06-CV-54, 2010 WL 11497105, at *8 (D.N.D. Feb. 18, 2010). The parties have not cited any North Dakota law standing for the proposition that the economic loss doctrine applies in the context of a contract for construction services like the one currently before the Court. As such, similar to JKC Michaels and based on the specific facts currently before it, the Court declines to apply the economic loss doctrine in deciding this motion.

Moving to the substance of the negligence claim, under North Dakota law, the elements of a negligence claim are "(1) duty; (2) breach of that duty; (3) causation and (4) damages." Barbie v. Minko Const., Inc., 2009 ND 99, ¶ 8, 766 N.W.2d 458. "Generally, the existence of a duty is a preliminary question of law for the court to decide." Id. "Whether a defendant owes a plaintiff a duty is generally a preliminary question of law for the court to decide; however, if the existence of a duty of care depends on resolving factual issues, then the facts must be resolved by the trier of fact." Doan ex rel. Doan v. Bismarck, 2001 ND 152, ¶ 12, 632 N.W.2d 815 (internal citation omitted). "If no duty exists, there is no negligence." Rogstad v. Dakota Gasification Co., 2001 ND 54, ¶ 12, 623 N.W.2d 382.

Lake Country/Bouvette argues that Hanover's negligence claim fails as a matter of law because "this action arises out of contract." Doc. No. 45, p. 4-6. As well-stated by this Court:

> the Court looks to well established North Dakota case law regarding the requisite showing that must be made when a negligence claim is asserted in a contract action. A duty may arise from a contractual promise or it may arise out of a relationship. Layman v. Braunschweigische Maschinenbauanstalt, Inc., 343 N.W.2d 334, 340 (N.D. 1983). Under North Dakota law, a plaintiff must demonstrate breach of a non-contractual duty in order assert a negligence claim in addition to a breach of contract claim: "Conduct that constitutes a breach of contract does not subject the actor to an action in tort for negligence, unless the conduct also constitutes a breach of an independent duty that did not arise from the contract." Dakota Grain Co., Inc. v. Ehrmantrout, 502 N.W.2d 234, 236-37 (N.D. 1993); See Olander Contracting Co. v. Gail Wachter Investments, 643 N.W.2d 29, 39 (N.D. 2002) (applying Ehrmantrout and concluding negligence claim properly dismissed when no showing of a breach of an independent non-contractual duty); Pioneer Fuels, Inc. v. Montana–Dakota Utilities Co., 474 N.W.2d 706, 710 (N.D. 1991) (defendant entitled to judgment as a matter of law on the alleged negligence claim because the plaintiff failed to show that the defendant committed an independent tort, separate and distinct from its breach of contract); Cf. Merrill Iron & Steel, Inc. v. Minn–Dak Seeds, Ltd., 334 N.W.2d 652, 656 (N.D. 1983) (court did not error in allowing both negligence and contract issues to go to the jury when there is no claim that the court allowed damages without distinguishing between tort and contract or that the damage award resulted in double recovery).

JKC Michaels, 2010 WL 11497105, at *8. The "North Dakota Supreme Court has repeatedly concluded that breach of contract or warranty, alone, does not furnish a basis for liability in tort for negligence." Id. at *9 (citing Superior, Inc. v. Behlen Mfg. Co., 2007 ND 141, 738 N.W.2d 19, 28).

Here, on the undisputed facts, Hanover has not demonstrated that Lake Country/Bouvette committed any independent tort, separate and distinct from its breach of contract allegations under the Lake Country Subcontract. Hanover asserts that "Defendants owed Estvold a duty to exercise reasonable care in performing, overseeing, and managing the construction of the pole barn . . ." Doc. No. 19, ¶ 19. Tellingly, these are the same allegations as to the breach of contract claim. See id., ¶ 46. More importantly, as discussed above, the core of the dispute is whether the pole barn

was constructed in accordance with the specifications in the March 30 Contract and related Lake Country Subcontract. Said another way, there are no facts to support that Lake Country/Bouvette committed an independent tort beyond the alleged breach of contract. Therefore, as a matter of law, there is no independent tort that could serve as a basis for Hanover's negligence claims, and the Court grants Lake Country/Bouvette's motion for summary judgment as to the negligence claim (count I).

Ameribuilt raises a similar argument. Ameribuilt argues Hanover's tort-based claims "fail as a matter of law because the essence of the relationship between Estvold and Ameribuilt was contractual, and any duties arose under the contract." Doc. No. 54, pp. 4-5. The Court agrees. Again, Hanover has failed to demonstrate that Ameribuilt committed an independent tort beyond alleged breaches of the March 30 Contract. Once again, Hanover alleges that "Defendants owed Estvold a duty to exercise reasonable care in performing, overseeing, and managing the construction of the pole barn . . ." Doc. No. 19, ¶ 19. These allegations though, do not amount to a separate, independent tort; rather, the allegations are related to the March 30 Contract and Ameribuilt's performance under that contract. Indeed, Hanover has pointed to no independent tortious conduct by Ameribuilt. As such, the negligence claim fails as a matter of law, and the Court grants Ameribuilt's motion for summary judgment as to the negligence claim (count I).[11]

[11] Relatedly, Hanover argues that Ameribuilt is liable under the doctrines of vicarious liability and retained control for the negligence of Lake Country/Bouvette or R&R/Rud. Doc. No. 48, pp. 12-14. As stated above, this case is based on a breach of contract cause of action and there is no independent duty to support a claim of negligence. As such, the Court need not reach the issues of vicarious liability and retained control as there is no viable negligence claim to trigger these doctrines based on the specific facts of this case.

**4. Negligence per se (count II)**

Finally, Ameribuilt and Lake Country/Bouvette move for summary judgment on Hanover's negligence per se claim (count II). For the negligence per se claim, Hanover alleges that:

> 24) At all material times, the Defendants owed Estvold a duty to exercise reasonable care in performing, overseeing, and managing the construction of the [pole barn.]
>
> 25) Defendants breached that duty by violating the 2011 North Dakota State Building Code.

Doc. No. 19, ¶¶ 24-25. In response to the motions for summary judgment, Hanover asserts that the issue of whether the North Dakota State Building Code applies to the construction of the pole barn is "non dispositive to any of [its] claims, because none of the causes of action are solely predicated on the duty imposed by the code." Doc. No. 52, p. 11; see also Doc. No. 48, p. 15. Ameribuilt counters that "[c]learly the Negligence Per Se claim is predicated on an alleged failure to construct the pole barn to withstand the windspeed requirements of the Building Code, so applicability of the Building Code is dispositive of that claim." Doc. No. 54, p. 9. The parties' arguments regarding the applicability of the North Dakota Building Code and whether it is dispositive to the negligence per se claim, however, bypass a critical threshold issue: whether the negligence per se claim is viable under North Dakota law.

"It is clear that North Dakota law does not recognize a claim for negligence per se." Mehl v. Canadian Pac. Ry., Ltd., 417 F. Supp. 2d 1104, 1118 (D.N.D. 2006). "Under North Dakota law, '[t]he violation of a statutory duty is evidence of negligence and not negligence per se.'" Id. (quoting Kimball v. Landeis, 2002 ND 162, 652 N.W.2d 330, 336). Stated another way:

> It is well-established in North Dakota that violation of a rule or statute is evidence of negligence, but is not negligence per se. Larson v. Kubisiak, 1997 ND 22, ¶ 8, 558 N.W.2d 852 (citing Horstmeyer v. Golden Eagle Fireworks, 534

> N.W.2d 835, 838 (N.D. 1995); Ebach v. Ralston, 510 N.W.2d 604, 611 (N.D. 1994); Gronneberg v. Hoffart, 466 N.W.2d 809, 812 (N.D. 1991); Glawe v. Rulon, 284 F.2d 495, 497 (8th Cir. 1960)). Conversely, compliance with a rule or statute is evidence of reasonableness, but it is not dispositive as to an activity's reasonableness.

Kartch v. EOG Res., Inc., 845 F. Supp. 2d 995, 1004 (D.N.D. 2012).

Because North Dakota does not recognize a claim under the doctrine of negligence per se, the Court grants the motions for summary judgment s as to the negligence per se claim (count II). See Cousineau, 2001 WL 1640118, at *3 (explaining "if a plaintiff cannot support each element of its claim, summary judgment must be granted, because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.").

## III. CONCLUSION

The Court has reviewed the record, the parties' filings, and the relevant legal authority. Ameribuilt's motion for summary judgment (Doc. No. 38) is **GRANTED IN PART AND DENIED IN PART**. The Court **GRANTS** Ameribuilt's motion for summary judgment as to negligence (count I) and negligence per se claim (count II) but **DENIES** the motion as to the remaining claims. Similarly, Lake Country/Bouvette's motion for summary judgment (Doc. No. 44) is **GRANTED IN PART AND DENIED IN PART**. The Court **GRANTS** Lake Country/Bouvette's motion for summary judgment as to the negligence claim (count I) and the negligence per se claim (count II) but **DENIES** its motion as to the rest of the claims. Given the extensive briefing on the motion, the Court also **DENIES** Ameribuilt's motion for oral argument (Doc. No. 41). The Court will set a status conference in the coming days to discuss resetting the case for trial.

**IT IS SO ORDERED**.

Dated this 27th day of July, 2022.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court